Case number 14-3967, Sharon Ault, et al. v. Oberlin College, et al. Oral argument not to exceed 15 minutes for plaintiffs, 15 minutes to be shared by defendants. Stephen J. Moody for the appellant. Good morning, your honors. May it please the court, Stephen Moody for appellants. I would like to reserve five minutes for rebuttal. As this court well knows, this is a sexual harassment case. My clients sit to the rear of me here in the immediate first row. And these are all long-tenured employees of Oberlin College. They were cooks in the various dining halls and cafeterias of Oberlin College. Oberlin College has a contractual relationship with Bon Appetit that we believe make them joint employers, and that's something that I would like to discuss a little later. But to give you an idea of how toxic the environment was, my clients all sat down randomly on a break and realized that each of them had been harassed by more than one person, but by one person in particular, and one of the named defendants in this case, Dean Holiday. So much so that they began to speak about their experiences with one another. And they decided that they would report those experiences to the college through an avenue that they had been assured would help them in their plight should something like this happen. And they went to speak to the Oberlin Ombudsman's office. And they met with the Oberlin Ombudsman on at least three occasions. And on the last occasion that they met with the Ombudsman, they were threatened with their jobs. The Ombudsman told them that they should be careful about what they say and that they should not be initiating witch hunts and that they should watch themselves and that Dean Holiday would continue to be their supervisor. Wait a minute. I thought he got dismissed. They went to see the Ombudsman in April of 2011. Dean Holiday was not removed from the campus until September of 2011. And what was the reason for the delay? Does the record show? They were on notice, obviously, that these things had taken place, but they did nothing about it. And that's one of the problems that we have with this case, Your Honor. Well, I understand they had talked with the Ombudsman. But why would they think that the Ombudsman was the one who would be making the decision about Mr. Holiday's continued tenure? Well, every year, Your Honor, at the end of the summer, the Oberlin puts on meetings for its employees to discuss employee policy and to review policies. And I think the record is full of different trainings that they attended and those types of things. But what they would most assuredly do every year was present the Ombudsman, whom they call YB because her name is a very hard to pronounce name. But they knew that YB would come to present to them every year and would say, and there's testimony in this case, and would say to them, if you ever have a problem of any nature— My question was, why would they think the Ombudsman was a person who could remove anyone from a position? Or who could say whether a person would be— They would be relying on the Ombudsman to report it to the powers that be to make certain that they were protected. I don't believe that they thought that the Ombudsman had the power to remove any particular employee, but they certainly reached out to the Ombudsman's office for help, as the Ombudsman told them repeatedly and every year, that they should come to the Ombudsman's office if they had any problems. And that's what they did. And they went to see the Ombudsman on at least three occasions. And the Ombudsman threatened them with their jobs. It's unbelievable, but that's what happened. Well, the other problem with the statement that you made, before I interrupted and asked a question, was that this man was their supervisor, which I have to say doesn't appear to me to be the case at all. He may have been their coach, and he may have been someone that they could ask about, you know, how to do their jobs or whatever, but he was employed by a separate entity, and he had no ability to hire or fire any of your clients. Did he? I believe he did, and my clients believed he did. Well, do you have any evidence to support that,  He was presented with a document. I mean, there's a lot of evidence in a lot of different contexts in employment law about a personal belief of that sort not providing an evidentiary basis on which you may suffinding. He was presented with a document at his deposition that had his signature and another Bon Appetit employee's signature  Wait a minute. Where did you find, what was this now? Tell me again. He was presented, and in the district court opinion, they make reference to it, but he was presented with a document at his deposition that had his signature and another signature of a Bon Appetit employee disciplining an Oberlin College employee. So for me, what that says is there is at least a material issue of fact as to whether or not he was actually a supervisor. He was an executive chef. They were cooks, and for them to make the self-serving statements that, oh, he only coached them. Well, everyone believed that he acted as a supervisor, which begs the question, why would plaintiffs believe, appellants believe that he is their supervisor? Because he's acting as though he's their supervisor, and he's certainly issuing discipline, and that would be a very huge component into looking at whether or not he's actually a supervisor. And I know that they say, he's not a supervisor. But in that world, in those kitchens, Dean Holiday is a supervisor. And that's one of the problems that we have with this case. Also, the fact that I believe that the totality of the circumstances has to be looked at in a case like this, in sexual harassment cases, where maybe one of the acts against one of the appellants may not rise to the level of actionable sexual harassment. But if the court were to look at all of the events in their totality and see that one may stack upon the other, then certainly you can see that this environment was toxic and permeated and riddled with sexual harassment. So much so that it affected the way that they felt about themselves, that they were humiliated. Their testimony is that they felt ostracized. The testimony is that at least one of the appellants left the job rather than to go back after surgery, so that she would not be, so that she wouldn't face the people that, the other people that Dean Holiday supervised and that were part of his good old boys club. That they didn't want, that they were in tears at the thought of going to work every day. So he left, Dean Holiday was gone in September of what year? 2011. Okay, and your client that had the surgery, when was that? You'll have to pardon my memory, Your Honor, but it was after that time. Yeah, how long after that time? I want to say it may have been the beginning of the next year. Okay. And how long did the other two of your clients remain working at Oberlin after the? There are two that are still working there. Okay. And two are retired. Okay. And the testimony in this case is that rather than return from medical surgery, why not just retire? Because it was going to be too much for her to go back and face Dean Holiday's cronies. And that's one of the things that I wanted to emphasize in this case is that it wasn't simply Dean Holiday who was at fault here. And as you know, the old saying is, it takes two to tango. He had to have other people to play with and humiliate my clients. And there were several other people that were identified by my clients during deposition with whom he teased and conjoled and helped to ridicule the appellants, students. Other individuals who were not appellants in this case have also testified to the fact that the environment was riddled with sexual foreplay and innuendo. Okay. If your time is up, you'll have your rebuttal time. Thank you. You all intend to each take five minutes, is that right? All right. That's the goal. Well, that will be enforced. Yes. I mean, it's not only your goal, but your reality. Well, unless the individuals defer time to... Well, no. You've got five minutes. Sure, Your Honor. May it please the Court. My name is Amit Patel. I'm here on behalf of Oberlin College. As the Court is aware, this case was brought up by appellant only pertaining to the sexual harassment claim. Presumably, he's waived all arguments pertaining to the district court's order granting summary judgment on all of the other remaining claims for the plaintiff. As the Court is aware, the district court ruled in defendant's favor primarily based on the fact that plaintiffs could not allege or bring forward evidence of conduct that was sufficiently severe or pervasive. The Court looks to several factors to determine that. Some of that includes just the frequency of the conduct, the severity of it, whether it's physically threatening or humiliating, and one of the... You know, Ms. Patel, we know all that, but one of the issues lurking in this whole thing that I am still concerned about, whose idea was it to remove it to federal court? Well, all the defendants consented in it, but it was Oberlin College's primarily. And that was based on a Section 301? Yes, Your Honor. You have any authority for a removal to federal court on that basis? Well, in the plaintiff's initial complaint, he had... the plaintiff's counsel had alleged a breach of contract claim. And this Court has been very well settled that when there's a collective bargaining agreement in place, there's no separate agreements that an employee can agree to outside. Do you have any case where a sexual harassment case was taken into federal court on the basis, not of Title VII, but on the basis of Section 301? Well, sexual harassment, I don't know that there's one on point on that. However, the court in Fox v. Parker Hannafin ruled that a promise to avoid job harassment made by an employer was removable under Section 301 grounds because an employee could not separately negotiate outside of the collective bargaining agreement, and that the issues that the court would have to evaluate would surround the relationships and all of the matters that were developed and customs that were developed as a result of the collective bargaining agreement. And the only thing that refers to a collective bargaining agreement in this case is some clause in the CBA that says we won't allow sexual harassment, and that's it? Well, that is true, Your Honor. The other aspect of the breach of contract claim was that supposedly there was a reporting mechanism as well that the Oberlin College did not follow. The court would have to look to the party's CBA and the relationships and customs that had developed as a result of the collective bargaining agreement in order to determine whether if that was the case or not. Well, that's the case whether there's a CBA or not. I mean, the Ohio equivalent of Title VII imposes that obligation, doesn't it? It does. However, I would argue that in Ulrich v. Goodyear-Tyre, there was no concrete language in the CBA regarding the issue that was at hand, which in that particular case, which I believe the plaintiffs were claiming that they were entitled to be reinstated to the bargaining unit. I see. Now, you're talking bargaining unit and reinstatement and all these things that are necessarily part of a collective bargaining agreement. Yes. But I just don't know. I'm not familiar with a case where somebody successfully argued Section 301 under the guise of a clause in a CBA that promised not to have any sexual harassment. Do you have a case like that? It somewhat goes into that Payette v. 14 Penn Plaza, where the court determined that the contract was sufficiently concrete enough that they had jurisdiction over the collective bargaining agreement based on the clause in the contract regarding discrimination. In terms of— Which case is that? Payette v. 14 Penn Plaza. All right. Thank you. I've used up most of your time. We'll give you a couple of minutes, if that's all right with the presider. A couple of things, just to kind of address some of the areas that Mr. Moody expressed. I think the court should take a look at the district court's opinion in terms of the document that he referenced as supporting the claim that Mr. Holliday was a supervisor. Can I ask you something, because you don't have much time left? Sure. Do you distinguish in any way between the claim Ms. Fenderson makes and the claims of the other plaintiffs factually? Factually, they are somewhat distinguishable. Fenderson obviously had a little bit of a physical element in it. However, this court has, on numerous occasions, ruled that acts that were far more egregious, such as plaintiffs being touched on their breasts and things of that sort, on repeated occasions, were not actionable. In what cases would you suggest that we look at that are factually more egregious, that have been held not to be actionable? Sure. There's Fleener v. Hewitt v. Soap, where a co-worker exposed his genitals and struck the plaintiff with a ruler on the buttocks and threatened to force the plaintiff to engage in oral sex. Wait, wait. This is what? Which one? I'm looking now at your table of authorities. I'm sorry. Fleener v. Hewitt v. Soap Company. Can you spell the plaintiff's name? F-L-E-E-N-O-R. Okay. Got it. There's Clark v. UPS, where there was a vibrating pager placed twice on a plaintiff's thigh, and there was... Did all of these turn on the nature of the conduct, or did the basis for decision was some other issue in the case? They were squarely decided on whether or not the conduct was severe or pervasive enough. There might have been, in some of the cases cited, there's a number of cases cited in all of the defendant's briefs, as well as the district court's opinion, where this circuit has ruled that conduct that's far more egregious and physical was not sufficiently severe or pervasive. There's another case, Stacy v. Shoney's, where there's evidence of suggestive comments and someone touching a breast, and the plaintiff being leered at. My information shows that Fleener turns and was decided based on responding at superior liability. I mean, the allegations may have been more egregious, but that wasn't the basis for decision. Are you disputing that interpretation of Fleener? No, I'm not, Your Honor. Well, then, what I just asked you would have prompted you to explain to me that that was not the basis for decision in at least Fleener, and I'm wondering if it was the basis for decision in all those other cases as well. But the point is made. Sure. I apologize, Your Honor. Do you have anything further? No, I do not. Thank you for allowing me a little bit of extra time. I still haven't. The case we were talking about on the question of jurisdiction doesn't appear to be in your table of contents. You may not have put it in there because the issue wasn't being challenged. Are you talking about Fox v. Parker of Hannafan? No, I'm talking about something that began with P. Pyatt, I think. It was referenced in our lower court brief, but however, since the argument wasn't raised. Tell me what the plaintiff's name is. It's 14 Penn Plaza v. Pyatt. P-Y-E-T-T. Okay. Great. Thank you. Thank you, Your Honor. May it please the Court. Mr. Moody, Ms. Foley, Ms. Patel. My name is Robert Wolf, and I'm representing Eppley Bon Appetit. In response to questions that were asked of appellant, Mr. Holliday left Oberlin immediately upon receipt of the lawyer's letter, which is based on the evidence, the first notice that Bon Appetit received. That was in September of 2011. Ms. Ault resigned in May of 2013, almost 20 months after Mr. Holliday left. This is the individual who didn't come back after medical leave? Yes, Your Honor. And when explaining why at deposition, she attributed it to co-employees who were supporters of Mr. Holliday, not his conduct. The issue as to whether or not Mr. Holliday had the authority to discipline, there is not a dispute in the record on that. And if Your Honors would indulge me for a moment, I can just read for you how Judge Vecchiarelli dealt with that allegation. And it's in her opinion at page 22, footnote 11. She states, Review of Holliday's deposition reveals the plaintiffs are likely referring to a moment during his deposition when plaintiff's counsel showed Holliday what was purported to be a progressive discipline document from March 2014, which named a different individual whom Holliday agreed was a Bon Appetit employee as Altenberger's supervising manager. When asked whether this document, which was unsigned and had not been previously produced to defendants during discovery, changed his testimony that he could not discipline Oberlin employees, Holliday responded no. Accordingly, the record does not support plaintiff's contention. Starting with the letter from Mr. Basavice in September of 2011, in the complaint, in the amended complaint, in answers to interrogatories, and in their depositions, none of the plaintiffs believed that Oberlin, that Bon Appetit was their employer or that Mr. Holliday was. On the issue of severe or pervasive, I believe the key opinions were actually drafted by you, Your Honor, which would be the distinction between the Williams versus General Motors case that had 15 separate incidents of either sexually charged or alienating or cruel pranking behavior and also had a physical component. And I would distinguish that from the Bowman v. Shawnee State case where you did distinguish the Williams decision. And albeit in Bowman you said it was not clear that it was based upon gender, but you also continued to do the analysis of severe or pervasive. And in that case, although there was a physical component very similar to the one alleged in this case, a grabbing of a rear end accompanied by a graphic comment. And several incidents of sexually charged or inappropriate comments, they were sporadic, they were drawn apart, and you distinguished that case from the situation in Bowman where there were 15 separate incidents and the work environment really was altered in a pervasive way. Well, I take it from what's been said and I'm going to be much more familiar with the record before this is over, but I take it that what happened to Miss, is it Fenderson? That the other three plaintiffs, she didn't know what had happened to them and they didn't find out what had happened to her except through, is it Bowman that came across the incident? Is that right? The other three plaintiffs, I think Miss Bowman witnessed the incident. She testified she had no personal examples of any inappropriate conduct directed at her, but Enola Bowman did witness the alleged cooler incident. Other than that, no. And one of the plaintiffs allegedly witnessed another plaintiff being told to bend over again. Other than that, no. Each of the allegations, I can't tell you how many, each of the allegations were unique and only experienced by that plaintiff. Miss Alt had three. Over the course of three years, all comments, all inappropriate, but all GP-13 if we compare them to some of the other cases. Miss Altenberger claimed five, but one was talking to another woman, not a party, about a statement, so she really had four. None of the plaintiffs testified about an inability to do their jobs and we realize that performance at the workplace doesn't have to plummet downward in order for it to have an effect on the job, but there was no evidence in the record that these women were so affected. And the precedent from this court is that a single incident of physical conduct without evidence that the harassment unreasonably interfered with the plaintiff's work performance, and that's in the Bowman case, is not sufficient to create a hostile environment. That's which case? That's the Bowman-Vishani-Stalman. Bowman, okay. And there were a series of statements, you know, come back next time without your wife, that sort of thing. That was female supervisor, male subordinate. And finally, there is no evidence in the record that Bon Appetit was the employer of any of the plaintiffs and thus the 41-12 case cannot lie against Oberlin. It's unrebutted. Mr. Holliday and Oberlin, by contract, the service agreement contract with Oberlin, was the indicia of a supervisor or of an employer. Not hiring, not firing, not disciplining, not effecting compensation. And those decisions were made pursuant to the very clear terms of the collective bargaining agreement between Oberlin and the United Auto Workers Union. So, unless there are any other questions? No. Thank you so much, Sharma. May it please the Court, Diane Foley on behalf of the appellee, Dean Holliday. Your Honor, the only issue involving my client that has come before you involves the, according to the assignments of error of the appellant, are whether or not the incidents complained of were severe, sufficiently severe for basis as to constitute a hostile environment. Those two issues, whether it's severe or pervasive, have already been adequately, I believe, argued and briefed by co-counsel. So, I do want to address some issues that plaintiff's appellant has raised before you today that were not briefed. The only issue that he has argued that affects my client was whether or not he was a supervisor within the meaning of 4112. And as Mr. Wolf has just pointed out, not only was he not a supervisor, by virtue of the facts in this case, he was employed by an entity that was not even the employer of the plaintiffs. The appellant never raised before this court the issue of whether or not Mr. Holliday was a supervisor, although he did argue that this morning. Mr. Holliday, even if he was a supervisor by virtue of the Garcia, which he was not, and I'm prepared to explain why he was not, by virtue of the Garcia versus the Dabler-Chrysler case, which this court decided several years ago, even under 4112, even if there is vicarious liability because of the fact that he was a supervisor, there's no individual liability on behalf of Dean Holliday by virtue of this court's dispositive decision on that matter. But I am prepared to explain why he's not a supervisor. Despite what Mr. Moody said this morning, not one of the plaintiffs, now appellants, testified that he was their supervisor. In their answers to interrogatories, they named someone else as their supervisor. Each of the appellants was asked at deposition who their supervisor was and someone else was named. The court below correctly applied the Vance criteria for who was a supervisor in determining that Mr. Holliday was certainly not their supervisor. The Vance case was an extension, as you know, of the Theriger and Ellerth decisions, which did not define who was the supervisor for purposes of vicarious liability under Title VII. The Ohio Supreme Court has always adopted the Title VII analysis of sexual harassment cases and would most certainly do so in this case. In fact, most recently, in a case called Hauser, versus City of Dayton, the Ohio Supreme Court specifically said exactly what this court has said, and that is there is no difference between the analysis of vicarious liability under 4112 as between that and Title VII. In fact, the Ohio Supreme Court in the Hauser case most recently has said the difference in language in defining who is an employer under Title VII and who is an employer under 4112, there is no material difference. In both cases, the bottom line would be that any liability of the— there is no individual separate liability for the supervisor, even if one was deemed factually to be a supervisor, but rather the only liability is vicarious liability on behalf of the employer. But as to whether or not Mr. Holliday was a supervisor, the record is entirely one-sided. It's entirely one-sided. Argument of counsel is the only thing he had no authority to hire, fire, discipline, promote, demote, reassign, or affect any material term or condition of the appellant's employment. Unless the court has any additional questions, I think so. Thank you. Thank you, Your Honors. I just want to rebut some of the things that have been said here and that just from the most recent argument is that Mr. Holliday does not dispute that he was able to initiate discipline. And so, whether or not they're saying that he wasn't a supervisor because he didn't finalize it, I believe that that in and of itself, what they will admit to is enough to establish that he was a supervisor. You mean he could mention employee conduct to the actual supervisor who could then take action if appropriate? And put it on paper. Because again, they point to, and it's in the district court's opinion,  write people up. Bon Appetit employees write people up. To me, that's a supervisor. And so, plaintiffs did believe that he was their supervisor. And they have testified in their deposition to that point. The other thing, about the relationship between Bon Appetit and the college, and I believe that, even though the district court found that they were not joint employers, the Aaron Brewster v. Quinn case looks at the four factors that the National Labor Relations Board pointed out. But they also sit in Aaron Brewster that not all four elements needed to be present. The first was the interrelated operations. Obviously, their operations are interrelated. Bon Appetit is on the campus working with the school to do menus, produce the food, and to serve the students. Common management may be a question in this case. Number three, everything was done at the school. Four dining halls, Bon Appetit, Oberlin College. It's pretty obvious that they work together. Plaintiffs thought that they were their supervisors. So, you don't need all four of the elements in order for the joint employer doctrine to apply. I would submit that, for purposes of this case in Title VII, that that doctrine is applicable. Because, which also goes to whether or not Bon Appetit should be off the hook for not doing anything after April and waiting until September of 2011. They certainly knew what was going on with their employee. And the fact that they would argue that they were not notified by these appellants makes you question the rolling out of that argument that if there were 21 other contractors there, would appellants have to go to 21 other supervisors of all of those contractors and notify them? No. They would go to someone like the Ombudsman's office who would then give notice to the people who could do something about it in the kitchens. The other thing that they talked about, that you asked appellees about, was the factual distinction between Fenderson's complaints and the other plaintiff's complaints. And whether or not there were other cases out there that were as severe as this. And if you review the evidence in this case, you'll find that there is testimony that asked one of the persons who observed Dean Holiday pressing his genitals against Kathy Fenderson and trapping her into a cooler. And the attorney took out a stopwatch and said, I'm going to take this stopwatch and I'm going to press it and then you tell me how long it took for Dean Holiday to release himself from Kathy Fenderson after she struggled with him and told him to get off of her. And she started the stopwatch. 1,001, 1,002, 1,020, 1,021, 1,030. And she said, okay, now. And I don't think that there's anything that they're going to be able to point to that's going to show such severe... Very quickly, what's the case that is closest to this case involving Ms. Fenderson in which a single incident was held to give rise to a claim and the basis for decision was the nature of that single incident? I apologize. I don't have that here with me. Your Honor, I could submit something to the court, obviously. Okay. All right. Anything further? Yeah, I understand that one of your clients, maybe Ms. Bowen, is deceased. I would like to know that and to file something that will take her out of the case because she should not any longer be in this litigation if you do that for us. If you have a case, a single incident case that was sufficient to support the kind of finding you want us to make here, I'd certainly like to have it. And then I think, was there something that you all, one of you offered that you'd like to have? Is there a time frame that you'd like to have that? Yeah, by Monday. Very well. Thank you. Thank you. All right. We appreciate the argument that all of you have given and we will consider the case carefully.